IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


GREGORY PARSONS, et al.,

        Plaintiffs,

v.                                    CIVIL ACTION NO. 2:07-00719

POWER MOUNTAIN COAL COMPANY,

        Defendant.


MEMORANDUM OPINION AND ORDER

        Pending before the court are the respective motions for
summary judgment of the plaintiffs, Gregory Parsons, David
Boothe, and the United Mine Workers of America ("UMWA")(Doc. No.
23), and of the defendant, Power Mountain Coal Company ("Power
Mountain")(Doc. No. 20).  For the reasons set forth below, the
court grants summary judgment in favor of plaintiffs.

I.  Factual and Procedural Background

        The parties do not dispute the material facts in this
matter.  Plaintiffs Parsons and Boothe are retired coal miners
who formerly worked for HPM Corporation ("HPM"), a subsidiary of
BethEnergy Mines, Inc. ("BethEnergy").  HPM was a signatory to a
series of labor contracts entered into between coal operators and
the UMWA, among them the National Bituminous Coal Wage Agreement
of 1993 ("1993 NBCWA").[1]  Under this and subsequent agreements,

_____

        [1]  This court has previously detailed the history of
employee benefits negotiations between the UMWA and the coal

employees of signatory companies are provided with pension and retirement health benefits paid for by the individual employers. Where a retiree's employer is no longer in business, the so-called "orphaned" retiree is to receive benefits from the UMWA 1993 Benefit Plan ("1993 Plan").

In 1997, both Parsons and Boothe worked for Pehem Industries, also known as Anchor Mining ("Pehem"), which at the time was operating HPM's coal preparation plant. In October of that year, Power Mountain purchased this operation and, as required by the NBCWA, agreed to assume its predecessor's obligations under the collective bargaining agreement then in effect. It also became a signatory to the National Bituminous Coal Wage Agreement of 1998 ("1998 NBCWA"). At the time of the purchase, Parsons and Boothe were laid-off panel employees of HPM's parent company, BethEnergy. As such, they enjoyed panel rights to be called back to work based upon their seniority for work covered by the work jurisdiction clause of the collective bargaining agreement. In purchasing the HPM operations, Power Mountain assumed this panel and was subject to the panel rights of Parsons, Boothe, and the other panel employees.

---

industry. See Lewis v. Howell, Civil Action No. 5:05-00525, Memorandum Opinion entered April 7, 2006; UMWA Int'l Union v. Falcon Energy, Inc., Civil Action No. 1:99-00388, Memorandum Opinion entered March 19, 2002.

While the 1998 NBCWA was in effect, Power Mountain hired contractors to perform work which Local Union 2059 contended came within the work jurisdiction clause.[2]  As a result, a number of grievances were filed by active and laid off panel employees. Without admitting any breach of the agreement, Power Mountain in 2002 paid the local union $36,000.00 in settlement of the grievances ("2002 Settlement").  (Doc. No. 20 Ex. 3.)  The succinct settlement agreement concluded with the following provision: "It is further agreed that this settlement will not set a precedent for any future cases and the issues giving rise to the enclosed grievances shall not be referred to or relied upon by either party in any future disputes."  (Id.)  How the settlement was to be distributed was left to the union, which ultimately disbursed equal, $1,285.00 shares to Parsons, Boothe, and others.

A similar settlement was entered into on January 6, 2003, by which Power Mountain agreed to pay the local union $5,658.00, to be distributed by the union ("2003 Settlement").  The settlement agreement signed by the defendant and the union representatives stated simply that, as a resolution of the grievances in question, the parties "agree to the following settlement without setting a precedent for future cases.  The Employer agrees to pay

---

[2]  Although Power Mountain disputes that the work in question was covered by the clause, that issue is not material to the court's inquiry.

300 hours of back wages to Local 2059 for the bargaining unit work performed by contractors/supervisors on 8/31; 9/1; 9/2; 9/22; and 10/2/02." (Doc. No. 23 Ex. 5 at 59.) From this settlement, Parsons and Boothe each received payments of $471.50. (Doc. No. 28 Ex. 11 at 3.)

These settlement payments would provide the basis for plaintiffs' claim that Power Mountain is obligated to provide their retirement health benefits. Under the terms of the 1998 NBCWA, miners with twenty years of signatory service were now entitled to a "Special Permanent Layoff Pension" from the UMWA 1974 Pension Plan prior to reaching age 55 if they had credited service after the effective date of the 1998 NBCWA (i.e., after January 1, 1998). (Doc. No. 23 Ex. 1.) Because the 1974 Pension Plan allowed for credited service based upon settlement awards of back pay, it awarded Parsons 250 additional credited service hours and awarded Boothe 301 credited service hours.[3] They were each granted the special pension, with an effective date of October 1, 2003, for Mr. Parsons, and of June 1, 2002, for Mr. Boothe. (Doc. No. 23 Exs. 4, 5.) Consequently, the 1993 Plan designated defendant as the plaintiffs' last signatory employer, even though they had never actually done work for the company.

---

[3] Although Parsons and Boothe each received payments under both of the settlement agreements, only Parsons was awarded credited service by the 1974 Pension Plan for the 2003 Settlement; Boothe's credited service was limited to the 2002 Settlement payment. (Doc. No. 23 Exs. 4, 5.)

-4-

Parsons and Boothe each received a pension award letter from the UMWA Health and Retirement Funds which gave them further information about their eligibility for retirement health benefits:

> In addition to your pension, you and your dependents may be eligible for health benefits, when you reach age 55. When you are about to attain age 55, you should contact the last signatory company that employed you in a classified job. According to our records, that company was Power Mountain Coal Company; we have sent them a copy of this letter to notify them that they may be responsible for your benefits when you reach age 55.

(Doc. No. 23 Ex. 4 at 8; Ex. 5 at 6.)

The benefits to which these letters refer are established pursuant to Article XX(c)(3)(i) of the 1998 NBCWA:

> Each signatory Employer shall establish and maintain an Employee benefit plan to provide, implemented through an insurance carrier(s), health and other non-pension benefits for its Employees covered by this Agreement as well as pensioners under the 1974 Pension Plan and Trust whose last signatory classified employment was with such Employer and who are not eligible to receive benefits from a plan maintained pursuant to the Coal Act. The benefits provided by the Employer to its eligible Participants pursuant to such plan shall be guaranteed during the term of this Agreement by that Employer at levels set forth in such plan. The plans established pursuant to this subsection are incorporated by reference and made a part of this Agreement, and the terms and conditions under which the health and other non-pension benefits will be provided under such plans are as to be set forth in such plans.

Doc. No. 23 Ex. 1 at 3.)

Parsons reached age 55 on June 12, 2005, and Boothe turned 55 on April 21, 2007. When defendant's plan administrator denied plaintiffs' attempts to enroll in the health benefit plan, the

-5-

UMWA, in two separate actions, invoked the Resolution of Dispute ("ROD") process set forth in the 1998 NBCWA, which had since expired.  (Doc. No. 20 Ex. 8; Ex. 10.)   The ROD process is set forth at Article XX(e)(5) of the 1998 NBCWA:

> Disputes arising under this Agreement with regard to the Employer benefit plan established in (c)(3) above shall be referred to the Trustees [of the UMWA 1993 Benefit Plan].  The Trustees shall develop procedures for the resolution of such disputes.  In the event the Trustees decide such dispute, such decision of the Trustees shall be final and binding on the parties.  If the Trustees are unable to resolve the dispute, such dispute shall be referred to a permanent three-member arbitration panel selected by mutual agreement of the UMWA and the BCOA and maintained by the Trustees.  A dispute referred in this manner shall be decided by one member of the arbitration panel, determined on a rotating basis, whose decision shall be final and binding on the parties.  Precedent under the resolution of disputes mechanism previously in place shall remain in effect, and the panel shall be required to cooperate to assure the consistent interpretation of provisions under the Employer Plans under this Article.  Such disputes shall not be processed under the provisions of Article XXIII (Settlement of Disputes).

(Doc. No. 23 Ex. 1 at 8.)

Importantly, Power Mountain's Employer Plan also recognizes the authority of the ROD process:

> The Plan Administrator is authorized to promulgate rules and regulations to implement and administer the Plan, and such rules and regulations shall be binding upon all persons dealing with the Beneficiaries claiming benefits under this Plan.  The Trustees of the UMWA Health and Retirement Funds will resolve any disputes, including excessive fee disputes, to assure consistent application of the Plan provisions under the 1998 NBCWA.  The Trustees shall develop procedures for the resolution of such disputes.  In the event the Trustees decide such dispute, such decision of the Trustees shall be final and binding on the parties.  If the Trustees are unable to

-6-

> resolve the dispute, such dispute shall be referred to a permanent three-member arbitration panel selected by mutual agreement of the UMWA and the BCOA and maintained by the Trustees.  A dispute referred in this manner shall be decided by one member of the arbitration panel, determined on a rotating basis, whose decision shall be final and binding on the parties. . . .

(Doc. No. 20 Ex. 12 at 27.)

Power Mountain was notified of the filing in both Parsons' (ROD No. 02-038) and Boothe's (ROD No. 07-0009) cases, and submitted responses setting forth its position in both matters. (Doc. No. 23 Ex. 5 at 16-18; Ex. 4 at 16-19.)  These letter-form responses, which were submitted respectively on September 29, 2006, and July 5, 2007, present substantially similar arguments on the merits of the plaintiffs' claims.  In both cases Power Mountain observes that the miner in question never actually worked for the company, disputes any liability assigned to it based on the 2002 Settlement, and observes that it lacks records indicating which individuals filed the grievances that resulted in that settlement.  (Id.)  Indeed, as to this last issue, defendant in both responses requests "the assistance of the Funds in issuing subpoenas for documents to Local 2059 in the hopes that the Local union may have information pertinent to [the] ROD process." (Doc. No. 23 Ex. 5 at 17; Ex. 4 at 18.)  In both letters, defendant requests that the case be "kept open pending receipt of additional information produced as a result of this subpoena."  (Id.)

-7-

One notable difference appears between the two responses. At no point in the September 2006 response submitted in Mr. Parsons' case does Power Mountain take exception to the applicability of the ROD process.  In the July 2007 response in Mr. Boothe's case, however, defendant included the following paragraph:

> Initially it is Power Mountain's position that the Trustees do not have the authority to issue a ROD relative to Mr. Boothe's claim.  Power Mountain has not been signatory to any NBCWA since the 1998 collective bargaining agreement.  It has not been a participant or contributor in the ROD Trust.  In accordance with applicable law, Power Mountain has not been obligated to arbitrate any matters for the last four years.  As a result, the Company does not believe that the Trustees have jurisdiction over this matter.

(Doc. No. 23 Ex. 4 at 16.)

Shortly after defendant submitted this response, the UMWA Health and Retirement Funds contacted the ROD Trust referred to above, confirmed that Power Mountain was a participant, and notified defendant of the same.  (Doc. No. 23 Ex. 4 at 20.)  In both ROD cases, the UMWA Health and Retirement Funds notified Power Mountain that its challenge to its designation as Last Signatory Employer had to be addressed by a separate procedure under Article XX(g) of the 1998 NBCWA, in connection with which defendant could submit additional information supporting its position.  (Doc. No. 23 Ex. 4 at 20; Ex. 5 at 21.)  In both cases, the issue was referred to the Trustees of the 1974 Pension Plan, who confirmed that Power Mountain was properly designated

-8-

as the plaintiffs' Last Signatory Employer.  (Doc. No. 23 Ex. 4 at 29-30; Ex. 5 at 23-24.)  On January 20, 2007, the Trustees issued an Opinion of Trustees in Mr. Parsons' case concluding that Power Mountain, as the last signatory employer, was required to provide health benefits coverage for Parsons as a pensioner effective June 12, 2005.  (Doc. No. 23 Ex. 5 at 1-4.)  A similar opinion was issued in Mr. Boothe's case on October 24, 2007, determining that he was entitled to health benefits coverage from defendant effective April 21, 2007.  (Doc. No. 23 Ex. 4 at 1-4.)

After defendant refused to comply with the decisions of the Trustees, plaintiffs brought suit in this court on November 9, 2007.  (Doc. No. 1.)  Their complaint alleges three counts: Count One seeks enforcement of the ROD decisions as arbitration awards under the 1998 NBCWA; Count Two alleges that, in failing to provide health benefits to Parsons and Boothe, Power Mountain breached its obligations under the 1998 NBCWA; and Count Three asserts that defendant is liable to plaintiffs for benefits under the Employer Plan pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132.  (Doc. No. 1 at 5-9.)  For relief, plaintiffs request confirmation and enforcement of ROD decisions 02-038 and 07-0009, a declaration that Power Mountain breached its duties under the 1998 NBCWA and ERISA, compensatory damages including prejudgment interest on the amount of medical expenses plaintiffs have incurred, injunctive

relief compelling defendant to provide health benefits to Parsons and Boothe, an award of attorney's fees and costs under 29 U.S.C. § 1132(g), and other appropriate relief.  (Doc. No. 1 at 9-10.)

Defendant filed an answer and counterclaim on January 18, 2008.  (Doc. No. 10.)  In Count One of its counterclaim, Power Mountain seeks enforcement of its plan administrator's denial of benefits through a declaratory judgment.  (Id. at 10.)  Count Two asserts that Power Mountain is entitled to have the ROD decisions of the Trustees vacated on the grounds that its duty to arbitrate did not survive the expiration of the contract, that it is not a contributor to the ROD Trust, and that the ROD decisions did not draw their essence from either the 1998 NBCWA or the Plan.

The parties subsequently submitted cross-motions for summary judgment, which are fully briefed and ripe for review.

## II.  Standard for Summary Judgment

Turning to the issue of summary judgment, Rule 56 of the Federal Rules of Civil Procedure provides that

> [t]he judgment sought shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).  The moving party has the burden of establishing that there is no genuine issue as to any material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  As the United States Supreme Court of Appeals stated in Celotex,

-10-

"the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

Once the moving party has met its burden, the burden then shifts to the nonmoving party to produce sufficient evidence for a jury to return a verdict for that party.

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find, by a preponderance of the evidence, that the plaintiff is entitled to a verdict . . . .

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 250-51. Significantly, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. at 256. Finally, "[o]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

### III. __Jurisdiction__

Plaintiffs' complaint alleges that jurisdiction rests with this court pursuant to Section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, pursuant to ERISA, 29 U.S.C. §§ 1001, et seq., and pursuant to the Federal Arbitration Act, 9 U.S.C. § 9.  (Doc. No. 1 at 1.)

In its summary judgment motion, Power Mountain contends that the court lacks jurisdiction to hear Count Two of plaintiffs' complaint under Section 301 of LMRA.  (Doc. No. 25 at 11-12.)  It argues that the 1998 NBCWA expired effective December 31, 2002, and that, since January 1, 2003, claims by UMWA miners to health benefits from Power Mountain are governed by federal labor law, rather than by contract.  (__Id.__)  Defendant asserts that, because neither Parsons nor Boothe reached age 55 until years after the termination of the agreement, any alleged breach of the agreement by defendant must have occurred after it expired.  (__Id.__) Defendant therefore concludes that plaintiffs' claim falls within the jurisdiction of the National Labor Relations Board ("NLRB"), rather than the district court.  (__Id.__ at 12 (citing __U.A. 198 Health & Welfare, Educ. And Pensions Funds v. Rester Refrigeration Serv., Inc.__, 612 F. Supp. 1033, 1038 (M.D. La. 1985); __Int'l Union, UMWA v. Big Horn Coal Co.__, 916 F.2d 1499, 1500-01 (10th Cir. 1990).)

-12-

Prior cases from this district, however, have established that the type of benefits at issue here are vested benefits, the right to which extends beyond the termination of the contract. See Lewis v. Howell, No. 5:05-0525 (S.D. W. Va. Apr. 7, 2006)(Faber, C.J.); UMWA v. Falcon Energy, Inc., No. 1:99-0388 (S.D. W. Va. March 19, 2002)(Faber, J.); UMWA v. BethEnergy Mines, Inc., No. 2:99-0738, 2001 U.S. Dist. LEXIS 6242 (S.D. W. Va. March 19, 2001)(Goodwin, J.); District 29, UMWA v. Royal Coal Co., No. 5:85-0292, 1987 U.S. Dist. LEXIS 14578 (S.D. W. Va. Jan. 5, 1987)(Knapp, J.).

To the extent defendant argues that plaintiffs' rights to health benefits did not vest until they reached age 55, its position is refuted by BethEnergy.  In that case, which arose under the 1993 NBCWA, the court concluded that, for purposes of determining a miner's pension and health benefits, he "retires" as of his last day of signatory or credited service, whether or not he is old enough to begin receiving benefits at that time. BethEnergy, 2001 U.S. Dist. LEXIS 6242, at *5.  Because Boothe's last day of credited service was December 31, 2000 (Doc. No. 23 Ex. 4 at 29), and Parsons' was in October 2002 (Doc. No. 23 Ex. 5 at 23), their retirement health benefits vested prior to the expiration of the agreement.[4]

---

[4]  On October 1, 2008, Power Mountain submitted supplemental authority in support of its jurisdictional argument, Poore v. Simpson Paper Co., No. 05-36060, 2008 WL 4291174 (9th Cir. Sept.

Defendant's motion for summary judgment as to Count Two of the complaint is therefore **DENIED**.  Jurisdiction exists under the statutes set forth above.

## IV.  <u>Analysis</u>

Count One of the complaint seeks enforcement of the ROD decisions of the Trustees as the product of binding arbitration, while Count Two of the counterclaim pursues the opposite.  Only where a party has contractually agreed to submit a dispute to arbitration may he be compelled to do so.  <u>Cumberland Typographical Union No. 244 v. Times and Alleganian Co.</u>, 943 F.2d 401, 404 (4th Cir. 1991)(citing <u>AT&T Techs., Inc. v. Communications Workers of America</u>, 475 U.S. 643, 648 (1986)).  "[W]hether a dispute is arbitrable under a collective bargaining agreement is a question of law for the court."  <u>Cumberland</u>, 943 F.2d at 404 (citing <u>AT&T</u>, 475 U.S. at 649).  "If the court determines that the matter in dispute is a matter designated for arbitration by the parties in their contract, Section 301(a) of the LMRA allows the specific enforcement of the arbitration agreement."  <u>Cumberland</u>, 943 F.2d at 404 (citing <u>Textile Workers Union v. Lincoln Mills of Alabama</u>, 353 U.S. 448, 450-51 (1957)).

---

22, 2008), in which the court dismissed a suit sua sponte for lack of subject matter jurisdiction.  (Doc. No. 32.)  Having reviewed the <u>Poore</u> case, the court finds it readily distinguishable on its facts and also in conflict with mandatory Fourth Circuit precedent.  <u>See</u> <u>Keffer v. H.K. Porter Co., Inc.</u>, 872 F.2d 60 (4th Cir. 1989).

-14-

As the Fourth Circuit explained in <u>Cumberland</u>, in determining whether a labor dispute is subject to arbitration, the court is to consider four principles established by the Supreme Court:

> Under the first principle, the parties must have contracted to submit the grievance to arbitration. The second principle requires that the court determine whether the contract provides for arbitration of the particular grievance in question. The third principle demands that the court not decide the merits of the grievance while determining the arbitrability of the dispute. Finally, if the contract contains an arbitration clause, a presumption of arbitrability arises. The court should not decline to order arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."

<u>Cumberland</u>, 943 F.2d at 404 (quoting <u>AT&T</u>, 475 U.S. at 650).

The broad language of Article XX(e)(5) of the 1998 NBCWA clearly triggers this presumption. That provision directs, without limitation, that disputes arising under the wage agreement with respect to the employer benefit plan are to be referred to the Trustees through the ROD process. (Doc. No. 23 Ex. 1 at 8.) Power Mountain's Employer Plan further provides that the Trustees are to resolve "any disputes . . . to assure consistent application of the Plan provisions under the 1998 NBCWA." (Doc. No. 20 Ex. 12 at 27.)

Power Mountain takes the position that its obligation to submit disputes to the ROD process ceased with the termination of the 1998 NBCWA. In support of its argument, defendant cites

-15-

Litton Financial Printing Division v. N.L.R.B., 501 U.S. 190
(1991), in which the Supreme Court clarified that postexpiration
disputes as to the terms of a collective bargaining agreement may
remain arbitrable where the disputes "arise under the contract."
The Court explained that

> [a] postexpiration grievance can be said to arise under
> the contract only [1] where it involves facts and
> occurrences that arose before expiration, [2] where an
> action taken after expiration infringes a right that
> accrued or vested under the agreement, [3] or where,
> under normal principles of contract interpretation, the
> disputed contractual right survives expiration of the
> remainder of the agreement.

Id. at 205-06.

With respect to the timing of the facts and occurrences at
issue, defendant observes that the plan administrator's denial of
benefits occurred postexpiration, that Parsons and Boothe each
attained age 55 postexpiration, and that the Pension Plan's
designation of Power Mountain as the Last Signatory Employer
occurred postexpiration.  (Doc. No. 25 at 15.)  Plaintiff
counters that both the 2002 Settlement and the payment from that
settlement to Parsons and Boothe occurred during the term of the
agreement, that the work period attributable to that settlement
fell within the term of the agreement, and that plaintiffs
"retired" and vested in their right to lifetime health benefits
during the term of the agreement.  (Doc. No. 28 at 9.)  Because
Litton does not appear to require that all of the operative facts
and occurrences arise before expiration of the agreement, the

-16-

court is inclined to find that the first Litton exception
applies.

In any case, it is evident that the second and third
exceptions are satisfied in this case.  As explained above,
Parsons and Moore vested in their right to retirement health
benefits as of their last day of credited service, which occurred
prior to expiration of the 1998 NBCWA.  Because the Plan
Administrator's denial of benefits occurred after termination of
the wage agreement, the second Litton exception is met here.
Moreover, the nature of the lifetime health benefits makes clear
that the benefits at issue are intended to continue after the
agreement's termination.  See, e.g., District 29, UMWA v. Royal
Coal Co., No. 5:85-0292, 1987 U.S. Dist. LEXIS 14578 (S.D. W. Va.
Jan. 5, 1987)(Knapp, J.)(clear language of wage agreement
expressed intent of parties to provide retired miners with health
benefits as vested lifetime benefit surviving expiration of
agreement).

Although the parties assign opposing significance to the
provision, Article V of the Employer Plan, entitled "Amendment
and Termination," further indicates the persistent nature of the
retirement health benefits provided under the plan.  With regard
to post-termination amendments, the Employer Plan directs that,
"[s]ubject to section C, following termination of the 1998 NBCWA,
this Plan may be modified, amended, or terminated by BCOA and the

-17-

UMWA, <u>or by BCOA or the Employer as permitted by law</u>."  (Doc. No. 25 Ex. 12 at 40 (emphasis added).)  The Section C excepted from this provision sets forth a "Special Rule for Certain Pensioners":

> The Employer will provide, <u>for life</u>, only the benefits of its own eligible Pensioners who retired between February 1, 1993 and January 1, 2003.  The benefits and benefit levels provided by the Employer under this Plan are established for the term of the 1998 NBCWA only, and <u>may be jointly amended or modified</u> in any manner at any time after the expiration or termination of the 1998 NBCWA.

(<u>Id.</u> (emphasis added).)  Accordingly, whereas the plan permits benefits for non-pensioners to be modified unilaterally at least to some extent after the termination of the 1998 NBCWA, benefits for pensioners are to be provided for life; the parameters of the benefits may be modified only jointly after termination of the agreement.[5]

Furthermore, as noted above, the Employer Plan reserves to the Trustees of the UMWA Health and Retirement Funds the authority to resolve "any disputes" arising under the plan, without limiting that authority to the duration of the wage agreement.  (<u>Id.</u> at 27.)  In <u>Cumberland</u>, the Fourth Circuit

_____

[5]  Power Mountain emphasizes the "only the benefits of its own eligible Pensioners" language from this provision as being supportive of its position, apparently with the idea that no other provisions of the Employer Plan or the 1998 NBCWA should inform one's reading of the phrase.  Defendant's argument in this regard is misplaced, however, particularly in view of the history behind the provision.  <u>See Dist. 17, UMW v. Brunty Trucking, Co.</u>, 269 F. Supp. 2d 702, 708-09 (S.D. W. Va. 2003)(Goodwin, J.).

addressed a similar issue in the context of a lifetime job guarantee agreement ("LJG") included in collective bargaining agreements entered into between a union and an employer. Cumberland, 943 F.2d at 404-06.  Construing Litton and an earlier case upon which Litton relied, Nolde Bros. Inc. v. Bakery & Confectionery Workers Union, 430 U.S. 243 (1977), the Court found the dispute to be arbitrable:

> It is clear from the wording of the parties' grievance-arbitration clause that any dispute over the construction of the LJG was covered by this broad grievance-arbitration procedure during the term of the collective bargaining agreement.  Moreover, as the district court observed, the job guarantee right is a vested right that continues after the expiration of the main collective bargaining agreement.  The cases interpreting Nolde have held that in order to "arise under" an expired contract, a dispute must involve rights which to some degree have vested or accrued during the life of the contract.  The parties here expected that the LJG would continue after the expiration of the main collective bargaining agreement.  If they had intended to exclude arbitration of disputes over the vested job guarantee right after expiration, one would expect to find such an exclusion in the grievance-arbitration clause.

Cumberland, 943 F.2d at 405 (internal citations omitted).

The Cumberland court was further persuaded to enforce the arbitration provision due to the parties' actions, which the court found to have manifested an intent to abide by the expired collective bargaining agreement and its grievance-arbitration procedure.  Id. (citing Int'l Brotherhood of Boilermakers, Local 1603 v. Transue & Williams Corp., 879 F.2d 1388, 1392-93 (6th Cir. 1989); United Paperworkers v. Wells Badger Industries, Inc.,

835 F.2d 701, 703-05 (7th Cir. 1987); <u>Taft Broadcasting Co. v.</u>
<u>NLRB</u>, 441 F.2d 1382, 1385 (8th Cir. 1971)).  In the instant case,
defendant provided notice to the UMWA that, as a result of its
December 31, 2002, termination of the 1998 NBCWA, defendant would
"discontinue adherence to . . . the referral of cases to
arbitration."  (Doc. No. 25 Ex. 2.)  Nonetheless, defendant
participated fully in the 2006 arbitration of Mr. Parsons' claim,
without making any objection to the authority of the ROD process
to resolve the issue.  It was not until Mr. Boothe's claim was
taken up in 2007 that defendant thought to raise any question
about the applicability of the ROD process or the jurisdiction of
the Trustees.  Even at that point, however, defendant still
engaged in the ROD process, submitting a response in defense of
its position, and requesting the Trustees' assistance in
subpoenaing records from the Local Union.  (<u>See</u> <u>supra</u>, 7-8.)

The Fourth Circuit has recognized that the "unconditional
submission of an issue to arbitration, without any objection to
the arbitrator's authority to decide that issue, 'cedes'
authority to the arbitrator, or represents 'consent' to
arbitration of that issue."  <u>Rock-Tenn Co. v. United Paperworkers</u>
<u>Int'l Union</u>, 184 F.3d 330, 334 (4th Cir. 1999).  Defendant's
conduct is thus persuasive evidence in support of the
arbitrability of the parties' dispute.

Where the court has determined that an issue before it was properly submitted to arbitration, the review it applies to the arbitration award is "among the narrowest known to the law."  Id. (internal citations omitted).  Quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987), the Rock-Tenn court summarized this "extremely limited" review as follows:

> The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.
>
> . . . As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.

Rock-Tenn, 184 F.3d at 334 (emphasis supplied).

Under this most circumscribed level of review, the court must uphold the arbitrator's decision so long as it "draws its essence from the agreement."  United Steelworkers v. Enterprise Wheel and Car Corp., 363 U.S. 593, 597 (1960).  Only where it is clear that "the arbitrator must have based his award on his own personal notions of right and wrong, . . . does the award fail to 'draw its essence from the collective bargaining agreement.'" E.I. DuPont de Nemours & Co. v. Grasselli Employees Indep. Assoc., 790 F.2d 611, 614 (7th Cir. 1986)(internal citations omitted).

Citing Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers Int'l Union, 76 F.3d 606 (4th Cir. 1996), defendant argues that this is such a case, as the Trustees relied exclusively on the determination made by the Pension Plan with regard to pension benefits, rather than making an independent determination as to plaintiffs' eligibility for defendant's health benefits.  Under the deferential standard set forth above, however, the court sees a justifiable basis for the Trustees' actions in the terms of the 1998 NBCWA and of the 1974 Pension Plan, under which issues concerning eligibility for benefits are reserved to the 1974 Pension Plan for full and final determination.  In contrast, the arbitrator in Mountaineer Gas ignored the mandatory language of a wage agreement requiring an employee's termination for violation of the employer's drug policy, instead "fashioning an entire[ly] new remedy and infusing his personal feelings and sense of fairness into the award."  Id. at 610.  No comparison can be drawn between the ROD opinions in Parsons' and Boothe's cases and the decision of the arbitrator in Mountaineer Gas, which clearly evidenced that arbitrator's personal disagreement with the employer's drug policy.

Defendant also argues that the Trustees' ROD opinion should be suspect because they have a conflict of interest in reviewing defendant's responsibility to provide benefits to plaintiffs. (Doc. No. 26 at 6.)  As defendant frames it, "affirming the Plan

-22-

Administrator's decision means the Trustees would have to provide
Parsons and Boothe benefits from their Plan." (Id.) Defendant's
argument is grossly weakened, however, by the fact that it was
precisely this framework which defendant bargained for in
entering into the agreement. Indeed, consideration of such a
"conflict of interest" renders the ROD process nugatory, as the
conflict would exist in all cases.

    Defendant further argues that the language of the 2002
Settlement Agreement prohibits plaintiffs' reliance on the
settlement for purposes of the credited service determination
made by the 1974 Pension Plan. As noted above, the 2002
Settlement Agreement included the following provision: "It is
further agreed that this settlement will not set a precedent for
any future cases and the issues giving rise to the enclosed
grievances shall not be referred to or relied upon by either
party in any future disputes." (Doc. No. 20 Ex. 3.) In support
of its position, Power Mountain cites District 29, UMWA v. New
River Co., 842 F.2d 734 (4th Cir. 1988). New River presents a
set of facts relatively similar to the instant case, but
defendant's reliance on it in this regard is misplaced.

    In New River, the plaintiffs, who had been laid off by New
River Company, filed a grievance alleging that New River had
violated the terms of the 1978 NBCWA. While that grievance was
pending, they obtained work with a different employer, Summerlee

-23-

Coal Processing Company.  After that employment ended, they received pensions under the 1974 Pension Plan, and were notified that Summerlee was responsible for their health benefits.  When Summerlee became defunct, the 1974 Benefit Plan and Trust began providing the health benefits.  Subsequently, the arbitrator presiding over the grievance against New River determined that the company had, indeed, violated the 1978 NBCWA and ordered it to compensate the plaintiffs.  New River and the plaintiffs then entered into a settlement agreement through which the plaintiffs received substantial lump sum payments in exchange for the execution of a thorough written release.  Id. at 735.

Based on the arbitrator's decision, the plaintiffs petitioned the 1974 Pension Plan for additional pension credit, which they were granted as a result of the arbitrator's award of back pay.  They were also informed, however, that the Trust would no longer provide their health benefits, because the award of back pay made New River, rather than the defunct Summerlee, their last signatory employer.  New River refused to provide health benefits, at which time the plaintiffs invoked the ROD process of the wage agreement.  In their ROD opinion, the Trustees concluded that the arbitrator's award made New River the plaintiffs' last signatory employer, and therefore obligated New River to provide health benefits.  Upon New River's continued refusal, the plaintiffs filed suit in this court and were granted a

-24-

preliminary injunction requiring New River to provide health benefits.  Id. at 735-36.

On appeal, the Fourth Circuit reversed the district court's order on the basis of the release signed by the plaintiffs when they settled with New River following the arbitrator's award.[6] It did so, however, based upon the very clear terms of the release, through which the plaintiffs released New River from "any and all actions, causes of action, and claims, including those sounding in contract arising as a result of their employment."  Id. at 736.  The limitation provision in the 2002 Settlement Agreement is absolutely perfunctory compared with the release in New River.  Notably, Power Mountain raised no objection to consideration of the 2002 Settlement Agreement during the ROD process, but rather cited the terms of the agreement freely in its responses.

Rather than supporting defendant's position, New River evidences the Trustees' consistent application of the terms of the wage agreements and the Employer Plans.  Enforcement of the

---

[6]  That release declared that the plaintiffs "released and discharged . . . The New River Company . . . from any and all grievances, actions, causes of action, claims or demands, whether sounding in tort, contract, or based on statute or otherwise, including but not limited to any and all claims which the undersigned may have had as a result of his employment . . ., or as a result of the termination of that employment, or as a result of the denial of seniority or panel or transfer rights after such termination, or in any manner relating to the [plaintiffs'] seniority or panel or transfer rights . . . or in any manner relating to the [grievance]."  842 F.2d at 735.

ROD decisions in this case comports not only with the stated goal in the 1998 NBCWA that the Employer Plans be administered consistently, but also with the sound policy that has embraced arbitration as a peaceful and efficient resolution to labor-management disputes.

## V.  Conclusion

For the reasons set forth above, the court hereby **GRANTS** plaintiffs' Motion for Summary Judgment (Doc. No. 23), and **DENIES** defendant's Motion for Summary Judgment (Doc. No. 20).  Having determined that it is without sufficient information to fix a monetary award, the court **DIRECTS** plaintiffs to brief the issue of damages by April 30, 2009, with defendant's response due as provided in Local Rule of Civil Procedure 7.1.  The court reserves issuance of a Judgment Order pending receipt of the parties' briefs.

The Clerk is directed to send copies of this Memorandum Opinion and Order to counsel of record.

It is **SO ORDERED** this 31st day of March, 2009.

ENTER:

David A. Faber
Senior United States District Judge

-26-